**SO ORDERED.**

**SIGNED this 25 day of June, 2013.**



_____
**James D. Walker, Jr.
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | CASE NO. 12-53285-JDW |
| MICHAEL L. TUCKER, | ) | |
| | ) | |
| DEBTOR. | ) | |

BEFORE

JAMES D. WALKER, JR.

UNITED STATES BANKRUPTCY JUDGE

COUNSEL

For Debtor:    Luman C. Earle
               1101-E Hillcrest Parkway
               Dublin, Georgia 31021

For Creditor:  Vanessa A. Leo
               Thomas S. Topping
               1930 North Druid Hills Road, Suite B
               Atlanta, Georgia 30319

**MEMORANDUM OPINION**

This matter comes before the Court on 21st Mortgage Corporation's objection to confirmation. This is a core matter within the meaning of 28 U.S.C. § 157(b)(2)(L). After considering the pleadings, the evidence, and the applicable authorities, the Court enters the following findings of fact and conclusions of law in conformance with Federal Rule of Bankruptcy Procedure 7052.

**Findings of Fact**

Debtor Michael Tucker owns a 2007 Horton Homes Mirage III, single wide, manufactured home; he purchased it in 2007, and it was delivered and set up in 2008. The home is on land owned by Debtor's brother; if the home were sold, it would have to be moved off the land immediately. The home is subject to debt in the approximate amount of $27,000, secured by lien in favor of 21st Century Mortgage (the "creditor"). Debtor filed an amended Chapter 13 plan that bifurcated the creditor's claim and valued the home at $8,000. The creditor filed an objection to confirmation, contending Debtor undervalued the home. Debtor concedes $8,000 is too low, but contends the correct value is $14,000, while the creditor argues for a value of $32,765.50. The Court held a hearing on the objection on May 30, 2013, at which time both parties presented evidence, including expert testimony, as to the value of the mobile home.

Debtor testified to the general condition of the home, which he rated as fair. He described the front and back porches as being in poor shape. Debtor's brother ran into the front porch, leaving the legs tilted. The railing and the steps to the back porch are falling off, leaving the porch unstable. The skirting is brittle and is partially detached. Molding throughout the home is

coming off. The front door has fallen off three times because it is not attached to a stud. Rain leaks into the house around the door and around the living room and bathroom windows. The cabinet doors fall off when opened due to loose screws. When Debtor flushes the toilet, toilet water bubbles up into the tub, a problem that continued even after he had the septic tank drained. Debtor is in poor health and is unable to make repairs physically or financially.

Debtor's expert, Dan Hester, conducted an appraisal of the mobile home using a market approach based on comparable sales and arrived at a value of $14,000. The creditor's expert, Victor Matistic, conducted an appraisal using a cost approach required by federal agencies that guarantee manufactured home loans and that incorporates data from the NADA manufactured home guide and arrived at a value of $32,765.50. The creditor also produced evidence of the NADA value in the amount of $29,293.95.

**Debtor's Appraisal.** Mr. Hester is certified by the State of Georgia as a general appraiser. He has been appraising property for 13 years and has been a certified general appraiser for 6 years. He testified that his experience with manufactured homes includes taking appraisal courses specific to mobile homes and appraising one to two manufactured homes per week in the six months prior to the hearing and 700 to 1,000 manufactured homes over his career; the manufactured homes he has appraised were located in the Middle Georgia area, covering 12 counties, and included both land and the mobile home. Mr. Hester visited Debtor's home on March 27, 2013. He inspected the interior and exterior of the property and noted some deferred maintenance issues with respect to paint, molding, floor coverings, and skirting.

For his appraisal, he used the market approach, also known as the sales comparison approach, which he testified is the primary approach accepted by lenders when they loan money

for the purchase of manufactured houses. He evaluated the sales of four comparable–but not identical–mobile homes. His sources of information for the comparables were the county property records, the Georgia MLS, and his external observations; he did not inspect the interiors. Because the comparables were sold with real property, he discounted the sales to account for the estimated contributory market value of the land. He looked to county property records to determine land value, but because his research indicated the county's values were too high, he did not use the full market value of the land but instead applied a more conservative value. Thus, he allocated a greater proportion of the total property value to the mobile homes. After making adjustments for the land and other differences, such as age, width, and gross living area, Mr. Hester applied a weighted average to arrive at a market value of $15,000 for Debtor's mobile home.

      Because the appraisal of Debtor's home excluded any consideration of real property, well, or septic tank, Mr. Hester included as part of his appraisal a consultation with the largest manufactured home dealer in Dublin, Georgia, which yielded an estimated value of $13,000. Based on the market approach and the dealer consultation, Mr. Hester's final opinion of value was $14,000.

      Mr. Hester's written appraisal report also included an estimated value based on cost approach in the amount of $23,880. He testified that the amount represented the cost to fabricate an identical home, less depreciation and an adjustment for condition. He testified that, in his appraisal, the cost approach is immaterial as long as it exceeds the amount produced by the market approach because its purpose is to verify that a new home could not be purchased for an amount less than the value of the subject property.

4

**Creditor's Appraisal.** Mr. Matistic has been employed in various aspects of the manufacturer housing industry and related fields for 40 years. He is a board certified manufactured housing appraiser[1] for personal property only. He was first certified to appraise manufactured homes in 1995, but did not begin appraising homes until four or five years later. He is recertified every year, which requires completion of a continuing education requirement. He has appraised manufactured homes for 8 to 10 years. He is currently averaging about two manufactured home appraisals per week. He has appraised manufactured homes throughout the Southeast, including Georgia, South Carolina, North Carolina, Tennessee, Virginia, Alabama, Florida, Indiana, and Missouri. He testified that the U.S. Department of Housing and Urban Development ("HUD") and the Federal Housing Administration ("FHA") require the use of NADA values rather than square footage and comparable sales for appraising manufactured homes. He further testified that when a lender seeks reimbursement on a HUD or FHA guarantee, the guarantee payment will be rejected unless the lender submits a National Appraisal System ("NAS") appraisal. Mr. Matistic conducted his appraisal using the NAS forms, which incorporate data from the NADA manufactured housing guide. According to Mr. Matistic, the NAS forms provide for the use of comparable sales only when a home is located in a mobile home park and will not be moved from the park. Because Debtor's home is not located in a mobile home park, Mr. Matistic did not use any comparable sales.

Mr. Matistic's appraisal starts with a base value of $32,585, which he testified is the

---

[1] It is unclear what board or entity confers the certification held by Mr. Matistic. At one point he referred to the American Association of Real Estate Schools and Colleges, but counsel for the creditor also described him as HUD certified or FHA certified. He is not certified or licensed through the State of Georgia, which offers no certification specific to manufactured housing.

value of a 2007 Horton Homes Mirage III that meets minimum HUD standards. He then adjusted the value for factors such as location of the home, condition of the home (which he judged to be fair), running gear (wheels, tow bar, axle, frame) included with the home, cost of needed repairs, components that exceed minimum HUD standards (such as roof, siding, appliances, flooring), and accessories that exceed minimum HUD standards (such as air conditioner, porches, steps, skirting) to reach a final value of $32,675.50, as is. If repaired, the value would increase to $35,700. Because Mr. Matistic's appraisal considers only the mobile home, no adjustment is made for land value. All values for adjustments are based on a 5-year depreciated value provided by NADA.

The creditor also produced a NADAguides Value Report for a 2007 Horton Homes Mirage III. The report was prepared by a paralegal in the office of the creditor's counsel, who was not present to testify at the hearing. The report shows a base structure value of $27,535. The value is adjusted for location and additional features, including central air conditioning, skirting, and steps, for a total adjusted retail value of $29,293.95. Counsel for the creditor explained that the final figure should be lowered by $500 due to an error in which the home's wood steps were erroneously identified as brick steps.[2] The report makes no adjustments for condition of the home.

## Conclusions of Law

At issue in this case is the creditor's objection to Debtor's Chapter 13 plan. At the heart of the objection is a dispute over the value of the creditor's collateral in a proposed cram down.

---

[2] The Court also notes that the Value Report appears to use a location adjustment for Michigan rather than Georgia.

When a confirmation objection raises issues of valuation, courts disagree about who bears the burden of proving value. Compare In re Kollmorgen, No. 11-10904, 2012 WL 195200, at *2 (Bankr. D. Kan. Jan. 20, 2012) (the burden is on the creditor) with In re Horner, No. 11-41012-MGD, 2011 WL 5152290, at *2 (Bankr. N.D. Ga. 2011) (the burden is on the debtor); see also In re Coleman, 373 B.R. 907, 911 (Bankr. W.D. Mo. 2007) (because claim allowance is implicated by this type of confirmation objection, the court should apply the burden-shifting framework used in the claims-allowance process). The parties in this case stipulated the burden is on Debtor. This Court agrees for the reasons explained by the court in Horner:

> As a general matter, the debtor has the burden to show that the Chapter 13 confirmation requirements are met. ... [T]hat burden is not relieved by the filing of an objection. Otherwise, a nonsensical situation would arise: the debtor would have the burden to show compliance with the cramdown provisions except when a creditor objects that the Debtor has not complied with those provisions. And because [the creditor's] rights as a secured creditor are being negatively affected for the benefit of Debtors, it is even more appropriate to place the burden on Debtors.

2011 WL 5152290, at *1-2 (internal citations omitted).

To be confirmed, Debtor's Chapter 13 plan must meet the requirements of 11 U.S.C. § 1325(a), including subsection (a)(5), which applies to secured claims. If the debtor proposes to retain the collateral securing a claim over the creditor's objection, the debtor's plan must provide for the creditor to receive payments equal to the present value of its secured claim. Id. § 1325(a)(5)(B)(ii).

The extent of a creditor's secured claim is established by § 506(a), which provides as follows:

> (1) An allowed claim of a creditor secured by a lien on property in

7

> which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditors interest.
>
> (2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, <u>replacement value shall mean the price a retail merchant would charge for property of that kind</u> considering the age and condition of the property at the time value is determined.

11 U.S.C. § 506(a) (emphasis added).

The parties do not dispute that a manufactured home is personal property. See O.C.G.A. § 8-2-181 (2004 Supp. 2012). Furthermore, the parties do not dispute that Debtor acquired the home, which he uses as his residence, for personal, family or household purposes. Therefore, in determining the amount of the creditor's secured claim, the Court must determine the "price a retail merchant would charge" for a manufactured home of the type, age, and condition of Debtor's home.[3]

The parties' appraisers took two different approaches in valuing the home. Debtor's appraiser, Mr. Hester, used the comparable sales or market approach commonly applied to the

---

[3] Retail is defined as "[t]he sale of goods or commodities to ultimate consumers[.]" Black's Law Dictionary 1430 (9th ed. 2009). A merchant is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction[.]" U.C.C. § 2-104(1); O.C.G.A. § 11-2-104(1) (2002 Supp. 2012).

8

appraisal of stick-built homes, which required him to "back out" the value of the land from his comparables. The creditor's appraiser, Mr. Matistic, used a cost approach, which he testified is required by the FHA and HUD for appraising manufactured homes, and which incorporates data from the NADA Manufactured Housing Appraisal Guide.

Mr. Hester's appraisal was based on four comparable sales, adjusted for a variety of factors, including age, width, and living space. Mr. Hester testified that when valuing the land for each sale, he used conservative figures, which allocated more of the value of each sale to the mobile home. The approach produced a value of $15,000. Mr. Hester consulted with a dealer in used manufactured homes to confirm his value. The dealer estimated that the type of manufactured home owned by Debtor would sell for $15,000 in good condition. Mr. Hester judged Debtor's mobile home to be in average condition, needing repairs costing approximately $2,000; thus his dealer consultation produced a value of $13,000. Based on these two values, Mr. Hester reached a final opinion of value of $14,000.

Mr. Matistic's appraisal was prepared using NAS forms. The general instructions for the forms state:

> The N.A.D.A. Manufactured Housing Appraisal Guide is the modified summation approach to value. Values reflected in the publication are based on market data received from a variety of sources in the nine N.A.D.A. regions, and these values represent a sited (delivered and set-up) structure in current year depreciated replacement retail dollars. <u>In the absence of local, reliable, similar comparable sales data, the values are considered to be FAIR MARKET RETAIL VALUES</u>.

Appraisal of Victor V. Matistic, docket no. 20, at B (emphasis added).

Mr. Matistic started with a base value of $32,585 for a mobile home of the type owned by Debtor

with a width of 16 feet and a length of 76 feet, which was slightly reduced to $32,300 for a location adjustment. The value was further reduced to $26,200, based on the Mr. Matistic's opinion that the home was in fair condition. He made additional adjustments for running gear (decrease of $882.50), cost of repairs (decrease of $2,075), components[4] (increase of $6,778), and accessories[5] less needed repairs (net increase of $2,745) to reach a final value of $32,675.50.

In Kollmorgen, the court was faced with similarly competing appraisals of a mobile home: the debtor's appraisal conducted by a provisional certified appraiser using the market based approach resulted in a value of $5,000 and the creditor's appraisal conducted by a certified manufactured house appraiser using the cost method with values derived from the NADA Manufactured Housing Appraisal Guide resulted in a value of $16,700. 2012 WL 195200, at *1-2. The Court found it appropriate to use the cost approach, which relied on "NADA value guide for manufactured homes as the starting point for determining the retail merchant value of the [debtors'] home[.]" Id. at *4; see also Coleman, 373 B.R. at 912-13. It noted that the NADA guide is accepted by other courts as evidence of the retail value of a mobile home and that the guide uses market data in producing values. 2012 WL 195200, at *2. The court, therefore, found the retail value of the mobile home to be $16,700 as calculated by the cost approach. Id. at *4.

In Horner, the court also had evidence of comparable sales and NADA values. The debtor

---

[4] Page B of the estimate defined a component as "anything which is built into the manufactured home or added to it in such a way that it becomes an essential part of the home and is BUILT TO A STATE OR LOCAL CODE." (Appraisal of Victor V. Matistic, docket no. 20, at B.)

[5] Page B of the estimate defined an accessory as "a feature or item which goes with the home, but is not built-in or permanently attached to the home (e.g., skirting, awnings, porch/decks, etc.) and is BUILT TO A STATE OR LOCAL CODE." (Appraisal of Victor V. Matistic, docket no. 20, at B.)

10

presented a mobile home appraisal in the amount of $9,500 developed using comparison sales and the testimony of the appraiser. Id. at *2. The creditor presented an appraisal in the amount of $30,900.40 developed using the NADA guide, and a witness who had inspected the property, but not the person who had produced the appraisal. Id. The court gave greater weight to the debtor's evidence because the appraiser was available to testify as to his methodology, which included analysis of three comparable sales of real estate and mobile homes that were adjusted for the value of the land and amount of living space. The debtor's appraiser also testified that "he does not rely on the NADA valuation for mobile homes because it does not adequately account for the economic conditions in the marketplace." Id. By contrast, the NADA valuation report offered by the creditor, standing alone, had minimal evidentiary weight. Id. Therefore, the court ruled in favor of the debtor. Id. at *3.

In this case, the Court has appraisals and expert testimony on both comparable sales and values derived from the NADA manufactured house guide as well as a separate NADA value report. The Court finds the value report has little evidentiary weight; the paralegal who generated the report was not available to testify, and the report was based on limited information about the mobile home. It did not, for example, account for the condition of the home.

By contrast, the two experts both provided probative evidence as to value based on their personal inspection of the home coupled with different types of market data. In Mr. Hester's case, he relied on comparable sales and a consultation with a retailer of used manufactured homes. In Mr. Matistic's case, he relied on values derived from the NADA which are "based on market data received from a variety of sources in the nine N.A.D.A. regions[.]" (Appraisal of Victor V. Matistic, docket no. 20, at B.) Mr. Hester testified that the comparable sales approach

11

is the method preferred by banks when lending money for the purchase of a manufactured home. Mr. Matistic testified that the NAS method is the approach required by HUD and FHA when a lender seeks to enforce a HUD or FHA guarantee after the buyer defaults.

While Mr. Matistic's appraisal represents relevant evidence of the retail value of Debtor's mobile home, the Court gives more weight to Mr. Hester's appraisal because it relies on actual sales of mobile homes as well as the opinion of a local dealer in used mobile homes. The Court concludes such evidence is more representative of current retail values for mobile homes sold in the Middle Georgia area. Therefore, the Court determines Debtor's mobile home has a value of $14,000. Because this value exceeds the $8,000 value provided for in Debtor's plan, the creditor's objection to confirmation is sustained. Debtor will have 30 days to file an amended plan that values the mobile home at not less than $14,000.

An Order in accordance with this Opinion will be entered on this date.

END OF DOCUMENT